Salmon are vital to Washington's people, culture, and economy, and the state has spent hundreds of millions of dollars over the course of decades to preserve and restore salmon runs. The district court here, nonetheless, felt it necessary to create a new treaty-based protection for salmon, even though that treaty right is not yet in effect. This right has no basis in the treaty language, goes far beyond any right ever recognized by this court or the Supreme Court, even though the district court acknowledged that it was not intended by the parties, and even though it is sure to lead to endless future litigation. So we're asking this court to reverse the district court's creation of that new right, or at the very least, to remand to the district court for consideration of the state's counterclaim and waiver defense, as well as for a significantly narrower injunction and narrower definition of the treaty right. Let me understand your first point. I think it's your first point. When you say there's nothing in the treaty that speaks to this issue, I want to understand what your reading of the treaty is. Would the state have the right, consistent with the treaty, to dam every salmon stream into Puget Sound? Your Honor, we would never and could never do that. We would never do it. I'm asking you a different question. Would you have the right to do that under the treaty? Your Honor, the treaty would not prohibit that, and there was no reason for the treaties to need to prohibit that, because the state would never do that, because the state has every incentive. So let me make sure I understand your answer. You're saying, consistent with the treaties that Governor Stevens entered into with the tribes, you could block every salmon stream into Puget Sound? Your Honor, the treaties would not prohibit that, and that is not an absurd result for a number of reasons. Number one, the district court here itself found that the parties did not intend to create any protection for the salmon. Number two, this court's decision in 1985 and the Supreme Court's decision in Fishing Vessel made clear that the treaties did not guarantee the tribes any minimum allocation of salmon. So the position of the plaintiffs here is just entirely inconsistent with those holdings. The claim here is essentially that they have a right to restoration of some unknown prior number of salmon, and this court has already said, no, there is no minimum requirement, and there doesn't need to be. Most importantly, Your Honor, there doesn't need to be, because the state, as I said, has already spent hundreds of millions of dollars, has every incentive to continue to do that, to preserve and restore salmon runs. So the other side is essentially asking you to read in a treaty right here because they think it's necessary, and it just simply is not. The state, as I said, has every incentive to maximize salmon runs for everyone. There's something in the record that says if the state were to proceed at the current rate, what the state is voluntarily proceeding, it would take 100 years for the state to take care of all the culverts that have, I think, 200 meters above them of potential spawning grounds. Is that right? Two points about that, Your Honor. First of all... No, is that right? It's a correct representation of what the pace for the State Department of Transportation. It ignores the other departments that are at issue here, all of which will have fixed every single one of their barrier culverts by next year under state law, and we're going to do that regardless of the injunction. Those are relatively few, I think. Those are... there were several hundred of them, Your Honor. They're just much less expensive to fix than the Washtenaw Department of Transportation culverts because they're not under things like Interstate 5. They're under forest roads and such. So the Washington Department of Transportation has been working aggressively for decades to repair culverts that are a significant problem. The district court found that it had already, before trial, fixed the majority of priority culverts where the state culvert was the only one on the waterway. But requiring the State Department of Transportation to replace all these culverts, in many instances, is an enormous waste of resources. It's an extraordinarily expensive proposition, Your Honor, and time-consuming. To replace a culvert under, for example, Interstate 5 with a bridge or a stream simulation culvert requires shutting down the highway for some extended period of time, extensive permitting, enormous labor, heavy equipment, and the like, and in many instances for very little gain. I mean, the 200 meters, keep in mind that 200 meters ignores if there are other man-made barriers on either side. So the district court's order requires us to replace a culvert even if there is literally... I don't think it ignores whether there are man-made barriers upstream. That is to say, it requires 200 meters upstream that's not obstructed. It's not, is that right? 200 meters to the next natural barrier, not to the next man-made barrier, Your Honor. There could literally be a county road or a tribal road or a federal culvert 10 yards away, and we would still need to replace that culvert. So that's an important point. That's part of why this injunction is so enormously wasteful and overbroad. It's going to require us to replace culverts that will truly make no difference because of other culverts or because the habitat is degraded in other ways. So, I mean, that just goes to the enormous overbreath of this injunction, Your Honor. So getting back to why this is a new right, the Supreme Court and this Court have recognized three distinct rights under the treaty related to taking fish. A right of access to usual and custom fishing grounds, a right to be free of many state fishing regulations, and a right to take a fair share of the available fish. And the right the District Court declared here goes far beyond any of those. And again, the District Court itself acknowledged that the parties didn't intend it, and it goes against, it goes far beyond the treaty language or any prior holding of this Court or the Supreme Court. Is there any prior right recognized to a certain quantitative level of fish harvest? Absolutely not, Your Honor. Not in this Court. I mean, this Court expressly held in the 1985 en banc opinion that the tribes that are entitled to at most 50% of the available harvest, whatever that number might be. So it specifically rejected the idea that they were entitled to a minimum quantum of fish. And in Fishing Vessel itself, if you look back at that opinion, at the beginning of the opinion, the Supreme Court lays out the parties' positions. And the tribes' position was that they were entitled to make a moderate living from fishing and that whatever was left over after that, everyone else could take. And the Supreme Court explicitly rejected that position and instead adopted the position that the tribes were entitled to at most 50% of the available harvest. And that's what this Court recognized in its 1985 en banc opinion. So there is not a case saying that. And it's a holding that's not only not supported by the treaties or the intention, it's not necessary, as I was saying. In 2007, don't get me wrong, salmon runs have declined over time for a number of reasons. But the state, including, I would add, in large part because of federal actions that have decimated salmon runs in this area, such as building the Lake Washington Ship Canal that wiped out completely the Black River and millions of salmon that used to live there, that sort of thing. But the point, Your Honors, is that this goes far beyond any right that has ever been declared and it's not necessary. In 2007, the last year in the record, the tribes harvested over 1.5 million salmon in the case area. By 2013, that number had increased to 4 million. There are fish there. The state is doing a lot to bring them back. And it was doing a lot long before the district court entered the injunction here. So there's just no need for this court to declare a new broad right that, as I said, is sure to lead to endless future litigation when the state is already taking these enormous steps. I mean, essentially what's happening here is that the state is, in a way, being punished for the good deeds it's already taken. Washington has been a national leader in recognizing the challenges posed by barrier culverts. We're the only state in the country with a stand-alone program to find them and repair them. The state identified its own barrier culverts long before anyone else had, and that then became Exhibit A in the lawsuit against us for the efforts we were undertaking to fix them. So what we really have here is an incredibly inequitable situation where the federal government gave us the design for these culverts, said, here's how we want you to build the culverts under state highways. They said that for decades. Now today... Was this just a general highway standard or was it specific to the state of Washington? It was a general highway standard, Your Honor, that all states were required to use, as I understand it. And it was not specific to Washington. Required, meaning I don't think there would have been anything in those days for you to have built culverts that would comply with this injunction. It's just you didn't have to, and what you did under the federal standard was perfectly permissible at that time. The federal government specified the design, Your Honor, that we used, and now they turn around and say, decades later, that design violates the treaty. No, my point was a little different. I'm sorry. I know they specified a design, and that was certainly a permissible design. I don't see the record as saying that if the state had chosen to build a design and then build a culvert that would allow free passage of fish, that that would have been impermissible under federal law. That's just not the record one way or the other, I think. Your Honor, I don't know that the record is entirely clear about that, in part because a lot of these directions were made in the 1950s and 60s, and the people who would have done them weren't around. But in any event, the federal government for decades gave us this design and said, use this. It also permitted many of these culverts specifically under the Clean Water Act. I mean, it reviewed specific applications for culverts and said, yes, go ahead and build that, while it had a fiduciary obligation to the tribe. So if those culverts violated the treaties, at the very, very least, the federal government should have said, hey, wait a minute. Another point I'd like to, I'll get to our counterclaims in just a second, but to that end, the federal government now is saying that WNNS stands for the proposition that no one can block access to salmon getting up or downstream. And WNNS does not stand for that proposition for at least two reasons. First of all, in that case, there was a non-tribal landowner who was refusing to give a tribe access to usual and accustomed grounds and who was taking all of the fish in the river with a fish wheel. So that case involved two rights that are now very well recognized under the treaty, a right of access to usual and accustomed fishing grounds and a right to a fair share of the available fish. This case goes far beyond that. And the point, though, that I want to get back to about the federal government is that if WNNS means what they now claim, then they just flatly ignored that decision for decades, that decision that they brought that case. They then built dams on the Columbia River, many of which have no fish passage mechanism whatsoever, such as Grand Coulee Dam, Chief Joseph Dam. So if WNNS now means what they say here, they were just in obvious violation of it for decades. And that brings me, Your Honors, to our counterclaim and our equitable considerations about the injunction. So first of all, I want to be very clear. We think that there should be no new treaty right declared. It's not supported by the text, by the intent, by the case law. But even if there is, Your Honors, at the very least, our counterclaim against the federal government should be reinstated. It's a classic recoupment counterclaim. It arises out of the same transaction. So what precisely are you asking from the federal government in your counterclaim? In our counterclaim, Your Honor, the heartland of our counterclaim is that the federal government gave us the design for these culverts, approved these culverts, and now is saying they violate the treaty. So we're asking that they be required, if these culverts violate the treaty, that they be required to pay part of the cost of replacing them. And it was dismissed at the motion to dismiss stage, so we never had an opportunity to develop facts about that at any length or exactly what percentage we would ask for or any of that sort of thing. It was just dismissed quite early in this case. I think it was 14 years ago now, quite some time ago, before we had an opportunity to do any of that based on sovereign immunity. And that was just a clear legal error. This is a recoupment counterclaim. Now, in our answer and our responsive pleadings, we've also made all sorts of other allegations about things the federal government has done. Those don't go so much to our counterclaim as they do to the equities here. For example, the fact that the federal government built the Lake Washington Ship Canal and lowered Lake Washington by 10 feet and wiped out this massive amount of salmon habitat, completely wiped out the Black River, that goes to, is it fair? Is it fair to hold the state entirely responsible for the declines in salmon that have happened over time through a variety of natural and man-made factors? But the United States has an odd position, or maybe I should say an unusual position in this litigation. It's not suing really on its own behalf so much as it is suing on behalf of the tribes. And, of course, it's not the tribes who built the Lake Washington Ship Canal. It's not the tribes that did the things to which you are now objecting. And to hold against the tribes actions of the United States merely because the United States, because of the 11th Amendment, is required to bring the suit on behalf of the tribes strikes me as odd. I'm not asking you to rule against the tribes because of actions of the federal government. We have sort of two separate arguments here. We're arguing that there is no treaty right based on the language, intent, and such, what I already talked about. But if there is one, at the very least the remedy should take into account that we might not even be here today if not for the federal actions that decimated salmon runs because the tribes might still be making a fine living from fishing if not for those federal actions. I mean, we don't know. But the federal government itself has taken actions that decimated Washington salmon runs and then to then sue the state, which has been a national leader in repairing culverts, in restoring salmon, and has been doing for decades this wide range of activities. You know, I have to say I'm sympathetic with the state vis-à-vis the federal government. But to the extent that this is a suit by the tribes as a practical matter, the tribes did not do what the federal government did. I agree, Your Honor. I'm not disputing that. But two points. First of all, again, the fact that the tribes didn't do anything wrong does not mean, as the Supreme Court made clear in Fishing Vessel, does not mean that the treaty guarantees them everything that in retrospect would have been helpful to the tribes. I mean, you have to still look at the treaty language. You can't, as the Supreme Court said in Choctaw Indian Nation, you can't add terms to a treaty later to correct a perceived injustice. And I'm not saying that the tribes did anything wrong, just that there is no treaty right here, and there doesn't need to be, because the state already has every incentive. You're asking us to reinstate the counterclaim against the government, the federal government. Yes, if you hold that there is a treaty right, then we're asking you to remand and reinstate our counterclaim. And based on your counterclaim, is the basic idea there that the state would like to be indemnified in all or in part if you're liable for costs of repairing culverts? Yeah, indemnification contribution, you could call it either one, but we think the federal government should have to pay part of the cost of replacing the culverts that they told us to install. The last point, just going to the equities, Your Honor, and then I'll try to reserve the remainder of my time, is that we're not saying that the tribes have done anything wrong, but even the tribes recognize that fixing culverts is not sort of in and of itself the best way to fix salmon. I mean, if you look in the record, we highlighted this in our briefing, one of the tribe's experts talked about a watershed restoration project that they undertook with state funding, and they fixed about half of the culverts in the watershed and then moved on to other projects that would have a bigger impact. Here the district court has ordered us to spend an enormous amount of money with a single-minded focus on culverts, and that's not what any expert testified in the record would be a good idea. So again, Your Honor, I'd like to reserve the remainder of my time, but we're asking this court to reverse the district court's creation of this new treaty right, or at the very least to remand for consideration. On that last issue, as a technical matter, would you be asking us to vacate the permanent injunction and remand for more findings and proceedings? If you agree with us about the treaty right? Sorry, I didn't understand the question. On the issue of whether the federal government has some responsibility. I see. So first and foremost, we're asking you to vacate the district court's finding of a new treaty right, and that would be the end of the case. But if you don't do that, then yes, we'd ask you to vacate the injunction, remand for a narrower injunction, and then also reinstate our counterclaims. Okay. And on the basic question whether there's a treaty right, this may be too hopeful a question, I guess. But if we were to somehow assemble every single thing that Isaac Stevens had either said about his negotiations or that some other biography writer had quoted somebody saying he said, would that really help us to know whether the right of taking fish under the treaty includes a right to have barriers removed like culverts? Well, Your Honor, the intent of the parties is certainly relevant. So if there was some clear intent there to prohibit anything that might diminish salmon runs, I think that would be quite relevant. But there just is not. And in fact, the district court found the opposite, that there was no intent to create a treaty-based protection for salmon. So we're not saying that that history is irrelevant. We're just saying it doesn't support the other side. Okay. I'd like to reserve the remainder of my time. We won't take away from your time. You're trying to preserve and to some extent we're intruding into that time, so we'll give you a chance to respond, so don't worry. I appreciate that. I want to come back to my earlier question, which is to some degree implicated by Judge Gould's questions, and that is under your interpretation of the treaty, the state of Washington has the right entirely to destroy the fishery. Your Honor, the treaties do not prohibit that unless it was done in a discriminatory way, as we've said in the brief. No, I just want to make sure that I understand your interpretation of the treaty. That is to say the treaty could guarantee to the tribes the right to fish at their usual and accustomed places. That's been interpreted to say they get up to 50% of the available fish up to the amount necessary to satisfy a need to make a moderate living. But you say it's consistent with the obligation upon the state to allow that that the state may destroy the fishery entirely. That's the position of the state. Your Honor, the treaties had no need to regulate that because the state had every incentive to maximize the number of salmon available for everyone. Neither side anticipated. No, but I think your answer is yes. That's your argument. The treaty would allow the state entirely to destroy the fishery. The treaties, Your Honor... I think the answer is yes. The answer is yes, but that's not an absurd result. Your question sort of implies that that's an absurd result, and it's not for a number of reasons. Number one, again, neither side anticipated that development could impact salmon runs. Number two, neither side intended for the treaties to create a protection for salmon. And number three, the district court here found that they specifically did not intend to create a protection for salmon. And again, this court and the Supreme Court have already held that the treaties don't guarantee the tribes any minimum number of fish. But as I said, that's not an absurd result because the state would never do that. I mean, an absurd result, it's not absurd if no one would ever do it, right? And no one would ever do that here because the state, as I said, salmon are vital to our people, culture, and economy. No, it's very clear that the state has acted on its own to preserve this fishery and to spend a lot of money on its own. I understand that. Well, and so what they're essentially asking you to do now is read this right in. If it's necessary, they're asking you to read it in 160 years after the treaties were signed, when there are countless other state and federal laws that protect salmon, and when the state is already spending hundreds of millions of dollars to preserve and restore salmon. So that's, I mean, I guess that all goes to why this is not, they're asking you to imply a right, and they're asking you to imply a right that's not necessary. And so we'd ask you not to do that. Okay, well, we've taken you to the end of your time. You sought to preserve five, and when you stand up again, we'll put five minutes on the clock. I appreciate that very much, Your Honor. Thank you. I hope you can hear. May it please the Court, I'm John Sledd on behalf of the Appalee tribes. I hope to use 12 minutes and to leave the balance of Appalee's time to Mr. Shilton for the United States. Your Honor, the district court's injunction and summary judgment should be affirmed for three reasons. First, it is consistent with prior precedent of this court and the U.S. Supreme Court. This court held in affirming Judge Bolt in his 1974 decision, neither side may destroy the resource that is the subject of these treaties. The state's legal position carried to its logical extreme would allow exactly that. This decision below is also consistent with the specific understandings of the parties regarding blockages to fish passage, and it is consistent with prior cases that have held that non-Indians cannot put devices in the streams that exclude the fish from the habitat they need to reproduce and thereby deprive the tribes of the fish they need to make a livelihood. The big problem with all of these cases, and I've had a few, is that we're trying to look back and then look forward from 1854-55 when no one who was involved in the creation of these treaties had any envisioning seer of the future that Interstate 5 and all of these culverts and all of the various developments that we have and the city of Seattle being what it is and all of these other cities in the Pacific Northwest. And yet you want us to suggest that the treaty envisioned culverts and not blocking culverts and not doing this, that, or the other thing to roads as a specific matter, not as a general matter. And this is always difficult. And that's the difficulty in these cases. And that's why they end up in the Supreme Court frequently. But keeping promises that are made 150 years ago in very different circumstances. Nobody promised that they would have salmon-free culverts because they didn't have culverts under freeways because they didn't have freeways. So what is the general promise that you are suggesting that the state of Washington made? As Judge Bolt found, the tribes left the treaty ground understanding that there would be nothing that the non-Indians would do that would impair their pre-existing fisheries. Obviously that's not what has happened. And in resolving that tension between what has happened with settlement and what the tribes were promised, the Supreme Court in the Wynand's case said, we're not laying down a bright-line rule. It remanded to the circuit court, what would now be the district court, for an adjustment and accommodation, saying that what is necessary in order to accommodate the cession of land to non-Indians is not a taking away of the tribe's pre-existing rights, but a limitation of them. And that's an equitable process that is not subject to a lot of bright-line rules. In this case we have the benefit. It's pretty amorphous. I mean, what does that mean? Well, there's a lot of amorphous in property law in terms of a nuisance action, what is reasonable. It's developed through the case law. And that's exactly what this court said in Phase 2, as we read the en banc decision, when the state intentionally interferes with the fish supply, it's subject to immediate judicial action. But there's that second clause at the end of the Phase 2 opinion, saying if it's not intentional, then the rights of the tribes and the duty of the state are determined on a case-by-case, fact-by-fact basis. And that's what we have done here. That is the genesis of this case. And the particular facts here make it an easier one for a couple of reasons. One, it is very similar to a couple of prior cases, one from the Supreme Court and one from this court. On the Winans case, it's foundational. There was much more to that than just the question of access or the excessive harvest. If you read the summary of argument of the U.S. Solicitor before the Supreme Court, he was complaining that the runs themselves were threatened, the reproduction of the fish was threatened, as well as upstream fishers. And the remand was intended to remove some of the wheels for both purposes. The second case that we point to would be the Adair decision from this court back in about 1984, which makes clear that it's not just actions directed directly or intentionally at the fishery, that can be restricted under the treaties to protect the tribe's rights. In that case, it's a water rights case. People are diverting water from a river system on which treaty fisheries exist. They're not intending to destroy the fishery. It's incidental, contrary to what the state argues. This court said that there's an implied water right there for the tribes to have sufficient water remain in those rivers to provide a fishery that will give them a moderate living. So in this case, we've got those two cases that are very similar, establishing the principle that you can't put a device in the stream that prevents the salmon from using the waters they need to reproduce if the consequence is the tribes don't have an adequate fishery. I'm interested in how far the underlying principle for which you're arguing, and I think the principle upon which the district court based its decision, how far this goes. Would the same principle support an order requiring the state and any state-controlled entity to remove dams on the rivers that feed into the Sound, or dams within the so-called case area? I think the question would have to be answered case by case. That is what Phase 2 says. The principle certainly could be applicable there, but there are a number of facts. Again, going back to Phase 2, look at the specific facts that would need to be asked. I'll assume that a dam has more than a de minimis impact on the fish run. Some of them, of course, do. Right, that would be the first question. We would look to the specific understanding of the parties. In this case, as we've indicated, the tribes had customs that you couldn't block fish passage. You had to remove your fishing weirs in order to allow fish to spawn. And the U.S. had laws that said you can't block streams. The Oregon Territory Organic Act says as much. So you look to that. You look at the extent of the impact on the non-Indian development. Here, they can build their road system. The roads were clearly contemplated by the treaties. We would need to ask how severe is the impact on the new development. I think you would look at similarities to past cases. What Phase 2 is suggesting is a common law process. We don't have a lot of precedent, but you would look to what were the facts on the prior cases. Proximate causation is another thing I think we would have to ask. If there are multiple defendants involved that had a part of that dam and multiple things happening, how much of the harm is really attributable to each? What are we supposed to do with the argument that the state makes that I confess has some force for me, that this order, while it may be beneficial to the salmon, has limited impact in certain areas, certainly for streams in which there are other impediments, either other culverts or other impediments that are human-made, and that there are a lot of better ways to do this. How do you respond to that? Talk about the other barriers first, and then we'll talk about the overall better ways to do it. The state did not give the district court the benefit of recommendations on how to accommodate these concerns. When it was asked at trial, at closing, tell me how long it would take you to come up with your own plan how to remedy this problem, state's counsel twice declined to do so and said no injunction should issue. It's hard to fault the district court for then proceeding without some of these more specific ideas that are being advanced now. Your position is kind of an all... Look, I'm not unsympathetic to these issues. I mean, I'm the judge that issued the order blocking the damming of the Snake River, which the United States never appealed. So we don't have dams on the Snake River in the manner that they were going to be. But in this case, you're taking the position that any action by the state that impedes in any way salmon violates a treaty, period. No ifs, ands, or buts, aren't you? I think the position is it has to be a legally significant violation. We're not saying every little trivial thing, and it has to be one that... Where do you draw that line? And that actually arches right back to Judge Fletcher's question. What about these culverts, which under the injunction will have to be fixed, that have a de minimis, the fixing of the culvert at some great expense would have a de minimis impact on saving salmon? I think if you examine the record as a whole, you'd be hard-pressed to find any biological support for the notion that there's a culvert out there that doesn't adversely affect the fishery. But you're right back to where we started again. Adverse to what degree? And that's the problem. You're taking the position, as I suggested before, that to any degree is sufficient, which would, as I think, and I'm not going to speak for Judge Fletcher, but you could then attack, if we were to rule for you and uphold that principle, you could attack in the courts for years to come the construction of virtually every dam in the state of Washington, virtually every hydroelectric plant, virtually every construction site, every bridge, on the theory that a fish or some fish might not get down it. And then what are you litigating? Whether it's de minimis. And what is de minimis? I think the de minimis is the threshold question. There's also the question of what the moderate living is, which the state did not attempt to argue here, but it's certainly a defense available. But even assuming, and this is the first injunction that's come up under this theory in 45 years that it's been pending in U.S. v. Washington. I don't think the tribes are leaping to jump on every little problem out there. This is a major problem. It's described by the biologists as the number one priority after protecting adequate habitat. What the district court did, it factored in exactly those concerns. If you look at the injunction with regard to the State Department of Transportation, it is tailored so the state can decide which culverts makes the most sense to fix. It can set aside Department of Transportation of its 800 that block more than 200 meters, up to 10% of the blocking habitat. And the evidence is that's about 250, almost a third of the culverts. The state can set them aside. They're not subject to a deadline. They'll get corrected if the state goes in and builds a new one, or if state law requires them to be corrected. So the judge had specific evidence and drew that equitable line about what is appropriate or not appropriate to require to be fixed under the schedule that he set. So that's, I think, exactly what Weinenz calls for. And it's the job, you as a district judge, I know, it's not always easy to look at all that evidence and someone has to draw a line. Did he send the injunction to culvert by culvert? The judge had before him... It didn't go, well, should it be culvert by culvert? The testimony from the state biologist, Mr. Benson, of the Department of Fish and Wildlife was that you cannot ascertain the impact of these culverts individually, one at a time, because the system's too complex. You have to look at it in the aggregate. It's a statewide road network, and the design of the culverts is driven by statewide policies, and their correction driven by statewide funding and statewide policies. And so a statewide remedy is appropriate under the case law, like the Lewis case, in that circumstance. I read the injunction, of course, we all have, and it is true that the state is under different obligations depending on the situation of the culvert and how much upstream water is available. The 200 meters line, if it falls into a certain category, they must do the work by a certain period. If it falls into the other category, which is obviously drawn in order to allow much slower replacement because the adverse impact on the fish is less, that only happens when the culvert is otherwise going to be replaced or the road redone, I get that. But those are pretty crude lines. Is there anything in the injunction that allows the state to come back in and to say, I understand that this culvert comes within the scope of the mandatory replacement, but in fact it's silly to do it. Can the state do that under the terms of the injunction with respect to sort of a particular culvert? The state could do two things. First, it could obviously go to the tribes and say, this doesn't make sense. We're all in this business together. But it could also make a motion under Rule 60 and under the RUFO decision to come in and modify. That is there for precisely those sort of things. And has the district judge indicated or invited such motions and such a motion would it be possible? The district judge delayed his injunction for three years after trial, and if you read his memorandum of opinion, it indicates he was hoping the parties would settle. There was a substantial amount of time for the state to come in during that period and make a recommendation for something different, which it did not do. If anything, it slowed down the path it was already on. Okay. Now, did you want to save some time for the government? I want to save the time for my colleague at the United States, so if there are no further questions, that'll be all. Thank you. May it please the Court, I'm David Shilton representing the United States. The United States is here in its capacity as trustee for the tribes, as it has acted throughout the U.S. v. Washington litigation, and we agree here that the treaties do impose a duty to refrain from building or maintaining road culverts so that they block passage of fish in a way that diminishes the fish that are available for harvest by the tribes. And I agree with Mr. Sled that the critical thing is to look at what the Indians would have understood was the promise made to them when they reserved their right of taking fish. They were told that they would have this right to sustain themselves from the fish runs in perpetuity. And the Supreme Court, I think, has made clear that what that meant is that other parties cannot crowd them out of their right to take fish and rely on those fish. That means that the state cannot allow overfishing, cannot allow other fishermen to take more than half, because that takes away from the Indians' right to sustain themselves. And this is really not so different, I think, if the state is maintaining culverts which block the fish, that takes the fish in the same sort of way. They're not available for continued harvest by the tribes. Let me ask the same question to you that I asked Mr. Sled. Why doesn't the principle that supports this injunction also go to dams? Can the tribes or the United States acting as representative or trustee litigating on behalf of the tribes come in and ask that dams owned or controlled by the state or localities of the state be removed? We agree with Mr. Sled that it could mean that. It will depend on the facts. As Phase 2 indicates, each case has to be taken on its own facts, so it will depend on is the effect more than de minimis. Road culverts can be built in a way that pass fish without harming them. Dams might be a slightly different factual situation in that by necessity they have to block the stream in order to accomplish what they're going to do. I can't predict how a court will interpret the right in that case. The court would also have to look at whatever legislation authorized the dam. Some of that legislation for the federal dams does specifically abrogate treaty rights. Others may not. It will be a case-by-case inquiry, but I think the same principle probably does apply. It strikes me as at least anomalous. I understand the law on the point that the state is forbidden from doing anything that would violate its treaty obligations or from abrogating the treaty. The United States, however, as a party to the treaty, can abrogate the treaty and build any dam it wants to. Well, Congress does have that ability to abrogate. It generally does so with compensation. But the United States, of course, is subject to the treaty duties. But by the very nature of a treaty, the United States can abrogate its treaty obligation. It can. But with regard to culverts, the federal agencies recognize that they need to repair their barrier culverts, and they are working on that. The question, though, of whether what the United States is doing affects the liability of the state, it's simply not relevant to that. Is the United States in this suit in any other capacity than as trustee representing the tribes? No, just as trustee. That's why we're here. Is that the answer to the recoupment question? Well, that's one answer, is that we are forwarding the tribes' right, and the tribes' right should not be affected by the United States' action. But the other answer is the only type of counterclaim you can bring against the United States in any suit is a recoupment one. And the counterclaim here was not one that sounds in recoupment. If you look at the counterclaim, which is found in the excerpts of record at ER 997 to 1000, what the state was asking for is affirmative relief, is declarations that the United States has not repaired its culverts and should be required to do so. Well, I thought what they were asking for is that if they have to go out and spend this money, having followed plans and specifications mandated by the federal government for the building of highways, back in the interstate highway days under the Eisenhower Act, that they should be able to recoup from the United States the costs and expenses of those remediations that were caused as a direct result of the United States requiring them to do something that the United States now says they shouldn't have done. So two answers to that. That sort of indemnification or contribution sort of action I don't think is what was applied and what was before the district court when it dismissed the counterclaims. But in any event, I don't think that would qualify as recoupment. To be recoupment, it has to arise from the same transactions as what the United States is suing over. We are suing over failure to maintain the culverts and I think what the counterclaims relate to a different set of transactions. And the exception to the rule that you need a waiver of sovereign immunity to sue the United States is a narrow one. And I've never seen it applied in cases except where the United States is directly seeking some sort of monetary relief. Did they go to the court of claims or something? The state, I don't think they would have a cause of action because only the tribes would have standing to say that the United States is not fixing its culverts and we want compensation. I can't think of any other cause of action they might have to deal with the actions of the United States back before the 1990s in approving culverts. We've got two questions going on here, at least as I see it, under recoupment. As I looked at the original claim for recoupment by the state of Washington, it was really kind of a sauce for the goose, sauce for the gander argument. Look, United States, if you want us to take care of our culverts, you better take care of yours. That's pretty clearly not recoupment in the sense required for getting out from under sovereign immunity. But they're now arguing, well, we're not trying to get you to remove your culverts. We're trying to get you to pay for at least part of the cost of redoing our culverts. Now, was that ever pled? I don't believe that one was ever pled. Their plea was, yes, sauce for the goose, sauce for the gander. But in any event, even if it was pled, I don't think there's an indemnification claim like that. I don't know what line of authority it would rely on. And part of that goes back to my question about whether the United States is suing in any other capacity than as representative of the tribes. No, and it's not. And for that reason, the waiver defense doesn't work. It's well established in this court's cases, including the shellfish case and the city of Tacoma case, that when the United States sues on behalf of the tribe as trustee, that the actions of agents of the United States can't be held to stop the United States from bringing that suit. And that was part of the Winans case, in fact. The question I'm now asking would assume somehow that some version of the recoupment would be allowed to go forward, which I'm not sure is true. But I want to ask the question about what the United States either required or permitted with respect to culverts. It's clear from the record that the United States said these culverts would satisfy any requirements that we have, and the state complied with those requirements. Does the record tell us anything about whether or not culverts that would have protected the fish would have been forbidden by the United States? Or was the United States merely saying, if you do this, you will take care of the requirements that we have. You might do something else. What do we know? I believe that the record would show that the United States, the Federal Highway Administration, was simply saying that if you comply with our standards, you meet our requirements, which were basically for safety and for preventing flooding, that sort of thing, but was not saying you can't go beyond this. It was a minimum standard. My present sense of the record is there's nothing in the record that would show that the state was forbidden at the time of constructing these culverts from making culverts that would allow free passage of the fish. That's my reading of the record, and it's a big record, and I've not read the whole thing. I believe that is a correct reading. I have a procedural issue or question. If, on some theory or another, we were to hold that the state of Washington should be intended to proceed against the federal government under some sort of contribution or recoupment theory that you could get past sovereign immunity with that, where would that leave the federal government in its ability to bring this suit on behalf of the tribes? Well, I presume it wouldn't keep us from bringing the suit, but it would seem that that sort of claim would have to be brought in the Court of Claims. If they want to bring a monetary claim, I don't think it would affect our ability to sue on behalf of the tribes for injunctive relief. So I think we could still do that, and certainly the tribes could sue for injunctive relief, whatever our actions have been or whether or not the state has a claim against us. Okay, thank you. Thank you. This is another question that goes to the possible scope of the underlying principles. There's evidence in the record that the culverts are a so-called number two priority, the number one priority being protection and preservation of habitat. How far does this go? For example, can the state be required under this theory of you cannot unduly interfere with the fishery? Can the state be required to adopt regulation that prohibits development close to streams, that requires the preservation of trees that shade the streams? I mean, how far does this go, not with respect to blocking access to the streams, but otherwise protecting the streams? As we see this right, it's a purely negative one. It says to the state you can't take action which blocks fish passage. It's not a positive right that says the state is responsible for restoring habitat or restoring the fish. The district court did not put it in those terms at all. This is only about actions of the state that have a direct effect on the fish runs by blocking a certain amount of habitat. It's limited because the district court only included culverts that were on the state's own list of culverts that needed to be fixed. Culverts under state-owned or operated roads. That's right. The state has no obligation for culverts of other entities. It only needs to fix its own culverts that it recognizes need fixing. This is really just about the fact that the state has not proceeded in an expeditious enough manner. As the district court said, at the present pace, the state would not be fixing the culverts for over 100 years. So that's really, I think, what it comes down to. Thank you. Thank you very much. Now, we took the other side over, as I rather expected. Let's put five minutes on the clock that is over time for you two. Thank you, Your Honor. I have four points that I'd like to make if time allows, but I understand if that's impossible. So first I'd like to talk about the recoupment counterclaim. I'm going to quote from excerpts of Record 993. The state described the U.S. role in funding and approving culverts. I'm not quoting yet, sorry. And then went on to say, if the state's actions do not satisfy some treaty-based duty, the state has reasonably relied to its detriment on the actions of the United States. The United States has a duty to pay all costs incurred by the state to identify and fix any and all barrier culverts. So the United States was on notice that we were. What were you reading from? From our counterclaim and answer at ER 993. And we went on to say, you know, just. . . You were seeking indemnification, basically, is what you were doing? I mean, to be fair, we were seeking a lot of things, Your Honor. We didn't know exactly how the case was going to take shape. You were seeking indemnification and contribution? Yes. In that particular place, we also later in our counterclaim asked for any other relief that the court deemed equitable, which it certainly could include this as well, even if we hadn't said it specifically. So we made a wide range of points, again, because we didn't know how the case was going to shape up. Now, also on recoupment, the fact. . . Well, first of all, the U.S. is bringing this case both on its own behalf and as representative of the tribes. That's very clear from the original Bolt opinion, 384 FSUP at 327. That's how they've always portrayed this. Even if they were only bringing it on behalf of the tribes, there's no. . . They haven't cited any case that says you can't then bring a recoupment claim against the United States in that posture. There's no case that says that. So I'm not even sure why that would be relevant. And the last thing on recoupment, Your Honor, Judge Fletcher, you've asked several times about whether we were required or just allowed. And I'm honestly not sure, but again, keep in mind, this claim was dismissed before we had any chance to develop evidence about it. So we should at the very least have a chance to develop some evidence about whether it was required or simply approved. So moving on, another point, Your Honor. On that point, though. Yes. The government, it seemed to me, was arguing that if you had such a claim, you might have to assert it in the court of claims, not in this action. And I take it, if I've read the government's statement right, that you don't agree with that. Absolutely not, Your Honor. This court and many other courts have held that you can bring a recoupment counterclaim. The federal government, by suing us, waived its sovereign immunity as to recoupment counterclaims. This is a recoupment counterclaim under this court's test, and it can be brought here. So you want us to say that the federal government can be invited to join the party if there's liability under the treaty. Well, again, Your Honor, they designed the culvert. They told us to use this design. But also, what's the answer to the question? I asked the government, if that were the case, where would that leave their ability to bring this suit on behalf of the tribes? Well, it wouldn't diminish the right of the tribes, Your Honor. It would just go to who has to bear the burden of paying for fixing these culverts. I mean, we're not saying that, as part of our counterclaim, we're not saying the federal government can't sue us about this. We're saying that if these culverts violate the treaties, they should have to pay part of the cost of fixing them because they specifically gave us the design and approved them. So that's the heart of our… If that were the case, would the government not have a conflict of interest in bringing the suit? Well, it might. I suppose it might have a… It's already brought the suit, Your Honor. I mean, I think it's already brought the suit. It's already, in my view, I mean, the federal government has already decided to take that chance. By filing this case, it opened itself up to recoupment counterclaims. Okay. The next point, Your Honor, is that Judge Fletcher asked about, you know, could the state completely destroy the fish? And I guess I want to go back to one… Excuse me. Sorry. In this court's 1975 panel decision, before it went up to the Supreme Court in Fishing Vessel, this court said, and this is at 520 F2nd 685, this court said, neither the treaty in the end nor the state on behalf of its citizens may permit the subject matter of these treaties to be completely destroyed. And that was based on some sort of property law concept. It's unclear whether that reasoning survives the Fishing Vessel decision, but we would be entirely comfortable with the court adopting that principle here, that neither side can completely destroy the res, the fish. But, again, there's no need why you need to impose that rule because the state would never do that anyway. I mean, we have… I think you've just gone back on your previous answer. Well, Your Honor, I'm saying you could go back and adopt this rule. I'm saying it's not supported by the current case law. This isn't… I think I heard you just say the state would be perfectly comfortable with our adopting that idea that neither side has the right completely to destroy the fishery. Did I misunderstand you? I'm saying that would be an acceptable principle to the state for the court to rely on. I'm not saying that that is supported by the treaties. I'm saying that would be a reasonable approach, much more reasonable than what the district court did. I'm not advocating it. I'm just saying if the court feels that there needs to be some backstop, we would suggest that it be that instead of this. The last one I'd like to make, this… Actually, you said you had four. You're five minutes in, but please make the other two that you'd like to make. Thank you, Your Honor. You're right. I do have two more, actually. The second to last is line drawing. You've asked a number of questions about line drawing, and it's a major, major problem with the district court's injunction. Line drawing is really primarily a policy decision for the federal congress, executive agencies, and state government. Specifying the design for culverts or choosing, you know, in the future logging rules or development rules or zoning patterns, those are policy decisions. The federal government has the power to affect those through laws, through regulations, through funding. They should be left to be worked out through those mechanisms, not through the district court. This case has been going on for 45 years. Under the district court ruling, it's going to go on for at least 45 more, and every one of those things is going to be the subject of litigation. So that's just yet another reason to not find a treaty obligation when it's not necessary. And the last point I'll add, Your Honor, is that the other side has talked a lot about the evidence of direct effect from culverts on salmon. And the reality is if you look through the record, you will find that there is truly no compelling evidence that state culverts have contributed significantly to the diminishment in salmon runs that have happened over time. The first large declines happened in the late 1800s and early 1900s, long before the state was building culverts. And if you look, I'd just point you to the sockeye salmon harvest. There are many ways to destroy a salmon run. There's only one. And I guess I'd just say, Your Honor, if you look at the sockeye harvest, 90% of that harvest comes from the Fraser River in Canada. And in 1985, the tribes harvested where the state has never built a culvert. The tribes harvested 1.5 million sockeye in 1985. They harvested 20,000 in 1999. So a 1.5 million swinging fish with not a bit of it attributable to state culverts, that's just one piece of evidence of how there truly is no evidence that state culverts on their own have contributed significantly to the diminishment in salmon. So those are the points I wanted to make, Your Honor. If you have any other questions, I'm happy to answer them. I have one question. If we were to vacate the permanent injunction and remand to the district court to answer some more questions, what would be your position as to what would be the questions that have to be answered that weren't answered in the prior proceedings? I hope you'll forgive me if my answer is a little bit long. First, I guess we'd say the treaty right needs to be defined. If the court's going to find a treaty right, which again we would disagree with, it needs to be defined far more clearly and far more narrowly. It needs to focus specifically on state culverts where there is some showing that the state culvert itself is blocking salmon from getting to a usual and a custom fishing area because otherwise there's really no evidence that the state culvert is causing any meaningful harm to the tribe. So the first would be to narrow the injunction to focus on where state culverts are by themselves. Sorry, not narrow the injunction, narrow the right, the treaty right, to where state culverts by themselves are actually causing harm, blocking access to a usual and a custom fishing area. The second would be to reinstate our counterclaim. The third would be to direct the court to narrow the injunction to focus on, to defer, to give far more deference to the state's priority system and to culverts that will actually make a difference. On to that one, did I mishear or was it misstated? I thought I heard that you had been invited in the litigation in front of the district court to say precisely that or do precisely that and you declined to ask for any of that. Well, two points on that, Your Honor. First of all, we were opposed to any injunction. We remain opposed to any injunction. My question is not that. My question is when you were invited to ask about how the injunction ought to be structured, my understanding is you said we're not going to play that game because we think the injunction is improper. Am I wrong? We did oppose the entry of any injunction. We did not propose a narrower injunction, but that does not. So I'm right. You did not ask in the district court for a different form of injunction. You just said no injunction. We did not propose a narrower injunction, Your Honor, but there's no case. The plaintiffs have not. So you want a chance now to do something that you declined previously to do. Well, Your Honor, the other side is claiming that we've waived the right to make this argument here, and they have not cited a single case holding that. I'm not asking about waiver, but I just want to make sure. You're asking now for a right to do something you previously declined to do. Well, Your Honor, I don't think. Is that right? We did not know that the district court was going to rubber stamp the injunction that the other side proposed that is wildly overbroad, and we shouldn't lose the opportunity to challenge the overbreadth and wastefulness of the injunction. You had no idea of what the state was proposing for an injunction? Sorry? You had no idea as to what the state was proposing for an injunction? Sorry, of what the other side was proposing? Excuse me, I misspoke. You had no idea what the tribes and the government were proposing for an injunction? Well, Your Honor, we had. You never saw it? Your Honor, I apologize that I was not part of the trial team. I do not know that level of detail about the. . . I would be astounded if your trial people never saw that injunction, and the first time they saw it was when it was signed and issued. I agree with that, Your Honor, but the district court had already promised us that equitable considerations would play a role in any injunction. We had already made a lot of the points about how fixing culverts makes no difference if there's another culvert 10 meters upstream and 10 meters downstream. We had already made a lot of the points that we hoped would inform the district court's entry of the injunction in the remedies phase. So it's not as though we just invented all this stuff later. This stuff is all in the record. All these problems are in the record. We just thought that no injunction was warranted. We opposed any injunction. But that doesn't mean that the district court didn't get it wrong. So that's our argument on that, Your Honor. So in conclusion, we just ask that you reverse the district court's creation of this new treaty right, or at the very least that you remand for consideration of our counterclaims and for a significantly narrower injunction and narrower definition of the treaty right. Thank you. Okay, thank you very much. Thanks for very good arguments on both sides in a difficult case. The United States v. State of Washington now submitted for decision, and we're in adjournment.
judges: Ezra, Fletcher, Gould